**MARUBENI AMERICA CORPORATION,**
**Plaintiff,**

v.

**M/V UNITY, her boilers, engines, machinery, tackle, and all other appurtenances belong thereto, in rem, Defendant.**

Civ. No. HAR 92–2655.

United States District Court,
D. Maryland.

Sept. 30, 1992.

James W. Bartlett, III, Richard Todd Schwartz, J. Marks Moore, Wilson, Elser, Moskowitz, Edelman and Dicker, Baltimore, Md., for plaintiff.

William R. Dorsey, III, Semmes, Bowen & Semmes, Baltimore, Md., for defendant.

## MEMORANDUM OPINION

HARGROVE, District Judge.

On September 21, 1992, the Plaintiff, Marubeni America Corporation ("Marubeni"), invoking this Court's Admiralty and Maritime jurisdiction, filed a Verified Complaint against the cargo ship M/V UNITY, *in rem*. Based on the Complaint, this Court promptly issued a warrant of arrest for the ship, and the vessel was arrested the same day. On September 24, 1992, Leona Shipping Limited ("Leona"), the owner and claimant of M/V UNITY, filed its Motion to Vacate the Arrest and to Dismiss the Verified Complaint. Pursuant to Federal Rules of Civil Procedure, Supplemental Rule for Certain Admiralty and Maritime Claims E(4)(f) and Local Admiralty Rule (e)(7), an expedited hearing was scheduled and held on September 25, 1992. Since that hearing, Marubeni has submitted a Memorandum in Opposition to Leona's Motion to Vacate, as well as several additional authorities, to which Leona has filed a Reply Memorandum. Moreover, Marubeni has also filed its Motion for Leave to File an Amended Verified Complaint.

The Court has reviewed all the materials submitted by the parties. For the reasons discussed more fully below, Leona's Motion to Vacate the Arrest of the M/V UNITY will be granted, Marubeni's Motion for Leave to File an Amended Verified Complaint will be denied, and the pending Verified Complaint will be dismissed.

### FACTS

On May 21, 1992, Marubeni chartered the M/V UNITY in order to transport, among other things, a cargo of sugar from Madras, India to the Domino Sugar Company in Baltimore, Maryland, U.S.A.[1] Marubeni alleges that, although it received the M/V UNITY in Madras, the owner, Leona Shipping Limited, materially violated several provisions of the written time charter

---

1. While the time charter indicates that "Crystal Rose Shipping Company, Ltd." is the owner of M/V UNITY, the parties do not dispute that Leona Shipping Limited is ship's actual owner nor that Leona is bound by the terms of the contract. According to the affidavit of Dimitr-ios Douvlis, director of Leona, the Time Charter's identification of Crystal Rose as the ship's owner is in error, and for purposes of this Memorandum Opinion, the Court accepts Mr. Douvlis' statement as true.

agreement. Marubeni's underlying argument is that Leona's breaches of the Time Charter caused delivery of the sugar to be delayed, and therefore, caused Marubeni either to incur unnecessary expenses or to have been overcharged for hire payments made at the outset. More specifically, as Marubeni proffered to the Court at last week's hearing, Marubeni alleges:

(1) that the time charter (lines 21–22 and clause 72) required Leona to deliver the M/V UNITY with "clean swept holds," prepared to receive the intended cargo of sugar but that upon delivery, the holds were dirty and unsuitable to receive the sugar. Consequently, the holds had to be cleaned in Madras which delayed the loading of the sugar and the start of the voyage;

(2) that the time charter (clauses 1 and 22) required Leona to deliver the M/V UNITY with all its equipment and gear maintained and working, but that upon commencement of loading, the ship's loading equipment broke down. Consequently, a shore crane had to be hired to load the cargo which delayed the loading of the sugar and the start of the voyage;

(3) that the time charter (lines 9–10) required Leona to deliver a ship capable of travelling, "fully laden and under good weather conditions" at 12 knots but that the M/V UNITY was incapable of steaming in excess of 9 knots. Consequently, delivery was delayed;

(4) that the time charter (clause 8) required Leona to provide a master who would "prosecute his voyages with the utmost dispatch ...," but that the vessel, without authorization, deviated from its course. Consequently, delivery was delayed; and

(5) that the time charter required Leona to provide a ship with working radar, adequate maps/charts and adequate sanitary facilities, but that Leona failed to do so. This resulted in the United States Coast Guard detaining the M/V UNITY at the mouth of the Chesapeake Bay until the conditions were remedied, further delaying delivery.

Marubeni concedes that during the M/V UNITY's voyage, Marubeni deducted from its semi-monthly charter hire payments what it estimated was the amount of "off-hire" resulting from delay. It asserts, however, that notwithstanding its previous deductions, Leona continues to owe "for monies paid in advance and not earned." Asserting that it now seeks reimbursement of an overpayment of charter hire, Marubeni states that it brought this *in rem* action for the sole purpose of obtaining security for its claims, which it concedes, are to be resolved through arbitration in London. (Verified Complaint, ¶ 5).

In addition to the terms of the standard form time charter which, as Marubeni pointed out, control the condition and delivery of the ship, the time charter has a typewritten addendum which discusses the parties' adjustment of expenses owing upon redelivery of the ship. More specifically, paragraph 49 of the charter party states:

The mutual settlement of all expenses (hire, bunkers, and other expenses) shall be adjusted and the balance either in owner's or charterers' favor shall be remitted within sixty (60) days after redelivery.

Paragraph 4 of the Charter Party provides that re-delivery is to occur "ON DROPPING LAST OUTWARD SEAPILOT SAFE GALVESTON/NEW YORK RANGE INCLUDING YONKERS ANY TIME DAY OR NIGHT...." At the present time, the M/V UNITY is off-hire and in dry dock pending repair; Marubeni concedes that it not be re-delivered until it drops its last outward pilot upon leaving the Port of Baltimore.

## DISCUSSION

■ The only basis for the arrest of a vessel *in rem* is the enforcement of a maritime lien in favor of the party suing the vessel and seeking the arrest. Gilmore & Black, *Admiralty* § 9–19, p. 622. (2d ed. 1975). "It is axiomatic that a 'maritime lien is the necessary basis for every admiralty proceeding *in rem*.'" *E.A.S.T. Inc. of Stamford, Connecticut v. M/V ALAIA*, 673 F.Supp. 796, 800 (E.D.La.1987) (*citing*

2 Benedict on Admiralty, § 21, at 2–4 (7th ed. 1986)). Under the general maritime law, a charterer has a lien on the vessel for breach of the charter by the owner, if the breach occurs after performance has begun. *Rainbow Line, Inc. v. The Tequila,* 480 F.2d 1024, 1027 (2d Cir.1973); Gilmore & Black, *Admiralty,* § 9–19, p. 631. Like an attachment before judgment, the arrest of a ship provides security for the lien holder in anticipation of its ultimate success on the merits of a dispute with the ship's owner. After the dispute is fully resolved, be it through litigation or arbitration, the ship can be sold to satisfy the amount owing. "Without the security obtainable through such a lien, the rights of a time charterer would often be very hollow.... The possibility of such a lien is commercially useful, for it provides a modicum of stability to, or assurance against, the transience of maritime affairs." *E.A.S.T., supra,* 673 F.Supp. at 804, *citing, Titan Navigation, Inc. v. Timsco, Inc.,* 808 F.2d 400, 404 (5th Cir.1987).

While a maritime lien may be extremely advantageous for the party alleging that a ship owner owes it money, the arrest of a ship deprives its owner during the resolution of the dispute of the unfettered use its property, not to mention any revenue it may earn from leasing the vessel. In recognition of this hardship, the party seeking to arrest a vessel must carry the burden of showing why the arrest or attachment should not be vacated. Supplemental Rule for Certain Admiralty and Maritime Claims E(4)(f).

In reviewing the specific charter party at hand, the Court is not persuaded that a breach has occurred, and thus has not been persuaded that the arrest should not be vacated. Unlike the facts of the cases cited by Marubeni in which the continued arrest of a ship was authorized, the

parties here do not necessarily disagree about monies owed; with a bit of luck and good faith negotiation, the parties may mutually agree about amounts owing and make appropriate settlement. Marubeni's claims, at root, are for expenses, in excess of what it already deducted as a set-off,[2] and under the terms of the time charter, those expenses are not due and owing until the parties have had the opportunity to sit down and "even up." The charter party, by its plain and unambiguous terms, establishes a sixty (60) day window, beginning at re-delivery of the vessel, in which the parties, without a judge's or arbitrator's intervention, can resolve their differences, if they have any. It is only after that period and in the unfortunate event that the parties cannot resolve their differences would a maritime lien and arrest of a vessel be timely.[3] Marubeni concedes that re-delivery has yet to occur, and that therefore, the sixty day period in which to remit payment has yet to begin. In other words, with respect to Marubeni and the M/V UNITY, the battle has yet to be joined.

This Court has reviewed a handful of decisions, only some of which were submitted by the parties, in which a ship was arrested pending judgment or arbitration. One consistent element in the cases reviewed, and an element glaringly absent from the case at bar, is the unquestionable existence of a live dispute. In *Construction Exporting Enterprises, UNECA v. NIKKI Maritime Ltd.,* 558 F.Supp. 1372 (S.D.N.Y.1983), cited by Marubeni at oral argument, the owner of a cement cargo sued the owner of the transporting ship for damages incurred when the ship sank with a loss of the entire cargo. There, the plaintiff, consistent with the terms of the charter party, initiated arbitration proceedings to recover damages for its lost property

---

**2.** The parties did not discuss, either at hearing or in their memoranda, the appropriateness of Marubeni's unilateral withholding of its hire payments, but this decision should not be interpreted to condone or ratify that practice under the given time charter.

**3.** This is not to say that a maritime lien and its concomitant arresting of a ship would necessar-

ily issue at that point. A Court would still have to be persuaded that the party seeking the arrest of the vessel was reasonably likely to prevail on the merits. This Court has not heard evidence from both parties, and thus makes no suggestion that it believes Marubeni will eventually prevail.

and sought an attachment to assure enforcement of the arbitration award. Thus, not only was there a ripe claim for recovery, but the arbitration proceedings had begun.

An existing dispute between the parties was also present in *Amstar Corporation v. M/V ALEXANDROS T.*, 431 F.Supp. 328 (D.Md.1977). There, the plaintiff sought to recover damages for losses it allegedly sustained when a cargo of raw sugar was delivered in damaged condition. In arresting the ship, Judge Harvey noted that the charter party called for the carriage of sugar from Corinto, Nicaragua to any one of several designated ports in the United States, including Baltimore. When the sugar was delivered to Baltimore and inspected, it was found to be wet, and therefore damaged. Thus the contractual obligation to deliver the cargo had been completed, and the plaintiff presented a dispute ripe for resolution, namely the adequacy of performance.

Similarly, in *E.A.S.T., Inc. v. M/V AL-AIA*, 673 F.Supp. 796 (E.D.La.1987), heavily relied upon by Marubeni in its Memorandum, the plaintiff sought to recover monies it had paid in advance to the owner of a ship for hire and for port and agency charges. The court, in finding the arrest of the ship to be proper, noted that the plaintiff had rejected the defendant's vessel because it claimed that it was unsuitable for the intended cargo. The owner then filed a counterclaim alleging wrongful rejection. It was clear to the judge that the time charter had been abandoned and that a genuine dispute between the parties existed.

Likewise, *Atlas Chartering Services, Inc. v. World Trade Group, Inc.*, 453 F.Supp. 861 (S.D.N.Y.1978), submitted at hearing by Marubeni, involved an agreement between the owner of a ship and an owner of cargo under which the owner would transport the cargo and the defendant would pay freight. The plaintiff-ship owner apparently carried some of the cargo and then alleged that freight was due and owing. Consistent with the terms of its charter party, the plaintiff initiated arbitration proceedings to recover the amount alleged to be due, and the court allowed a maritime attachment before arbitration. While the case did not involve the arrest of a ship, the maritime attachment was appropriate because there was a genuine dispute over monies owing and the arbitration proceedings had begun.

The undisputed facts in the case at bar indicate that because re-delivery has yet to be completed the time charter is not yet over. Unlike the cases discussed above, there has been no abandonment of the time charter agreement; Marubeni did not reject the M/V UNITY for non-compliance in Madras; nor is it apparent from the facts presented that Leona necessarily owes Marubeni any money. Instead, as occurs frequently in the time chartering of cargo vessels, there is a question at the end of the voyage over who owes who, and how much. The parties, both sophisticated, seasoned veterans of the ship chartering business, foresaw the likelihood of loose ends and explicitly prescribed a way wrapping them up at the end of the time charter. That method is articulated in Paragraph 49, and until that contingency is exercised, Marubeni's claim has not ripened into a breach for which a maritime lien can issue. This Court is unwilling to arrest Leona's ship in the unsupported anticipation that when the parties sit down to work out their differences, they will be unable to do so. Thus, this Court agrees with Leona that Marubeni's claim is premature, and that the arrest of the M/V UNITY should be vacated.[4]

It will be so ordered.

---

**4.** Marubeni's First Amended Verified Complaint does little more than restate the facts proffered to the Court during the hearing. It does not present a new cause of action, nor does it re-lieve the fact that Marubeni's claim that a breach has occurred, pursuant to paragraph 49, remains unripe.