DAVID N. HURD, United States District Judge *695 I. INTRODUCTION
On April 5, 2018, plaintiff Dampskibsselskabet Norden A/S ("Norden"), the commercial manager and agent for Orient Dispatch Shipping Co. Limited, the owner of the M/V Orient Dispatch (the "Vessel"), commenced this in rem admiralty and maritime action against defendant 25,001.078 metric tons of fly ash (the "Cargo") seeking to enforce and foreclose a maritime lien against Spartan Materials, LLC and Spartan Materials of Albany, LLC (collectively "Spartan"), the charterer of the Vessel, for outstanding demurrage and other costs and expenses due and owing under the terms of a November 20, 2017 charter-party contract (the "Charter Agreement").
On April 6, 2018, this Court issued an Order (1) directing the Clerk of the Court to issue a Warrant of Arrest in rem against the Cargo pursuant to Rule C of the Supplemental Rules for Certain Admiralty or Maritime Claims and Asset Forfeiture Actions ("Admiralty Rule C") and (2) appointing the Master of the Vessel and Coeymans Recycling Center, LLC ("Coeymans Recycling") as substitute custodians pursuant to Rule E of this District's Local Rules of Procedure for Admiralty and Maritime Cases ("Admiralty Local Rule E").
On April 10, 2018, Spartan moved under Admiralty Rule E(4)(f) to partially vacate the arrest of the portion of the Cargo discharged from the Vessel as of April 6; i.e., the approximately 17,000 metric tons of fly ash discharged before the issuance of the Warrant of Arrest in rem. The motion has been fully briefed and oral argument was heard on April 17, 2018 in Utica, New York. Decision was reserved.
II. DISCUSSION
Spartan contends Norden improperly asserted its maritime lien over all of the Cargo. According to Spartan, Norden cannot assert a valid lien over the portion of the Cargo discharged from the Vessel prior to the issuance of the Warrant of Arrest in rem because it was unconditionally delivered to the Port of Coeymans as part of a settlement agreement between the parties.
Spartan's request for partial vacatur of the arrest is based on Admiralty Rule E(4)(f), which provides in relevant part that:
Whenever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules.[1]
"At a Rule E(4)(f) hearing, a defendant may attack 'the complaint, the arrest, the security demanded, or any other alleged deficiency in the proceedings.' " Maersk, Inc. v. Neewra, Inc., 443 F.Supp.2d 519, 527 (S.D.N.Y. 2006) (quoting Aqua Stoli Shipping Ltd. v. Gardner Smith PTY Ltd., 384 F.Supp.2d 726, 728 (S.D.N.Y. 2005) ).
Importantly, at this hearing it is the plaintiff that bears the burden of showing that the arrest or attachment should not be vacated. See *696 Bay Casino, LLC v. M/V Royal Empress, 20 F.Supp.2d 440, 448 (E.D.N.Y. 1998) ("[A] plaintiff has the burden of showing that it is entitled to a maritime lien; if it cannot do so, the arrest fails and must be dissolved."); see also Supp. R. Fed. R. Civ. P. E advisory committee's notes ("The plaintiff has the burden of showing why the seizure should not be vacated.").
To carry this burden, the plaintiff "must demonstrate that 'reasonable grounds' exist for the attachment, and that all technical requirements for effective attachment have been met." Maersk, Inc., 443 F.Supp.2d at 527 (citing Ullises Shipping Corp. v. FAL Shipping Co. Ltd., 415 F.Supp.2d 318, 322-23 (S.D.N.Y. 2006) ); see also 20th Century Fox Film Corp. v.M.V. Ship Agencies, Inc., 992 F.Supp. 1423, 1427 (M.D. Fla. 1997) ("Plaintiff has the burden under Supplemental Rule E(4)(f) to come forward with sufficient evidence to show there was probable cause for the arrest or attachment of the [property].").
"When determining whether such reasonable grounds exist, 'Supplemental Rule E does not restrict review to the adequacy of the allegations in the complaint.' " Maersk, Inc., 443 F.Supp.2d at 527 (quoting Linea Navira De Cabotaje, C.A. v. Mar Caribe De Navegacion, C.A., 169 F.Supp.2d 1341, 1358 (M.D. Fla. 2001) ). "A court also may consider any allegations or evidence offered in the parties' papers or at the post-attachment hearing." Maersk, Inc., 443 F.Supp.2d at 527.
The dispute in this case boils down to whether Norden unconditionally discharged part of the Cargo at the Port of Coeymans before receiving the Warrant of Arrest in rem from this Court on April 6. According to Spartan, the parties had settled their ongoing dispute over the total amount that was then due under the Charter Agreement by negotiating certain up-front cash payments and additional security deposits into a trust account held by Spartan's maritime counsel to cover the amounts owed up to midnight on March 9, 2018.
Norden acknowledges Spartan made certain cash payments and deposited other amounts as security but vehemently denies that these actions evince Norden's intent to unconditionally discharge any portion of the Cargo. To the contrary, Norden argues that Spartan has repeatedly dragged its heels during various aspects of the parties' business relationship and as a result has run up a large-and-still-increasing tab under the terms of the Charter Agreement.
As Norden tells it, the parties reached an agreement on payments that would satisfy certain past due amounts, but demurrage and other charges continued to accrue under the terms of the Charter Agreement. Norden asserts that although Spartan has made efforts to "top-up" the amount held in trust as security in satisfaction of these accruing costs, it has repeatedly fallen behind on this obligation. See, e.g., Unger Decl. Ex. R.
"Under United States law, it has been settled for over a century that we presume a maritime lien exists in favor of a shipowner on cargo for charges incurred during the course of its carriage." Arochem Corp. v. Wilomi, Inc., 962 F.2d 496, 499 (5th Cir. 1992) ; Bird of Paradise, 72 U.S. 5 Wall. 545, 554, 18 L.Ed. 662 (1866) ("Ship-owners, unquestionably, as a general rule, have a lien upon the cargo for the freight, and consequently may retain the goods after the arrival of the ship at port of destination until the payment is made ....").
This kind of lien is ordinarily lost upon the cargo's "unconditional delivery to the consignee." In re World Imports Ltd., 820 F.3d 576, 584 (3d Cir. 2016) (citation and emphasis omitted); see also *697 Atl. Richfield Co. v. Good Hope Refineries, Inc., 604 F.2d 865, 872 (5th Cir. 1979) ("The lien for freight and demurrage is possessory in nature, and, therefore, it is ordinarily lost by unconditional delivery of the cargo.").
However, "because it would frustrate commerce to require shipowners to retain their liens only by actual possession of the implicated cargo, a shipowner enjoys a strong presumption that, absent a clear indication to the contrary, he has not waived his cargo lien upon the delivery of that cargo." In re World Imports Ltd., 820 F.3d at 584 (footnotes omitted).
"To overcome the presumption against waiver, a court determining whether a cargo lien has been waived by unconditional delivery may consider, among other things, whether there was an understanding between the parties regarding retention of the lien either before or at the time the consignee took possession of the cargo, whether there was a stipulation in the contract ... inconsistent with the exercise of a lien, or whether other security was taken when the cargo was discharged." In re World Imports Ltd., 820 F.3d at 584.[2]
Upon review of the parties' submissions, Norden has clearly carried its burden of demonstrating that the arrest should not be vacated. To begin, Norden's verified complaint and attached exhibits make clear that the terms of the Charter Agreement explicitly permitted Norden to place a lien on the Cargo for unpaid demurrage and other expenses. And on February 27, 2018, Norden transmitted to Spartan a Notice of Lien in which it invoked this right under the Charter Agreement.
To be sure, this initial Notice of Lien indicated that it would "remain in place and the cargo will not be discharged" until payment was made, language which might fairly suggest that any Cargo later discharged by Norden would be released unconditionally. But the course of the parties' subsequent dealings, and in particular the Notices of Lien transmitted on March 13, 2018 to P & M Brick, LLC, the stevedoring company with which Spartan had contracted at Coeymans to discharge the Cargo ("P & M Brick"), and to Coeymans Recycling, the entity with which Spartan had entered into an agreement to store the Cargo, indicate that a completely satisfactory arrangement for the provision of substitute security was never reached.
These March 13 Notices of Lien advised that Norden intended the lien to remain in place once the Cargo was discharged ashore, and were transmitted six days before any discharge operations ever began. Even assuming the parties' settlement agreement (and its accompanying "top-up" provision) was intended by the parties to secure the unconditional discharge of at least some portion of the Cargo, the presently available record indicates Spartan never managed to make good on the entirety of even those modified obligations.
Norden's decision to nevertheless proceed with an attempted discharge of the Cargo is best understood as a conditional delivery borne of exigent circumstances.
*698 Indeed, a review of the parties' submissions makes clear that Norden chose to take aggressive action to empty the Vessel itself after Spartan failed to hit important milestones: first, under the Charter Agreement, and then later, under the partial settlement.[3] See In re 4,885 Bags of Linseed, 66 U.S. at 114 ("[I]t would be a serious sacrifice of his interests if the ship was compelled, in order to preserve the lien, to remain day after day with her cargo on board, waiting until the consignee found it convenient to pay the freight, or until the lien could be enforced in a court of admiralty .... if the cargo cannot be unladen and placed in the warehouse of the consignee, without waiving the lien, it would seriously embarrass the ordinary operations and convenience of commerce, both as to the ship-owner and the merchant."). Accordingly, Spartan's motion will be denied.
III. CONCLUSION
Norden has carried its burden under Admiralty Rule E(4)(f) of showing why the seizure should not be vacated and therefore Spartan's motion will be denied.
Therefore, it is
ORDERED that
Claimants Spartan Materials, LLC and Spartan Materials of Albany, LLC motion to partially vacate the Warrant of Arrest in rem is DENIED. The Clerk of the Court is directed to terminate the pending motions.
IT IS SO ORDERED.

This District's Admiralty Local Rule E(e)8 requires that than adversary hearing be conducted within seven days of the arrest or attachment.

This language, cited by Norden, comes from the U.S. Court of Appeals for the Third Circuit. Spartan cites a case that states the plaintiff's burden of proof this way: "[t]o prove that the [Cargo] ] was conditionally delivered ..., [the plaintiff] must provide clear evidence that the parties intended the delivery to be conditional, that it needed to discharge the [Cargo] immediately ... or that the discharge was for the convenience of both parties." In re WCI Steel, Inc., 344 B.R. 838, 849 (Bankr. N.D. Ohio 2005). Both formulations refer to In re 4,885 Bags of Linseed, 66 U.S. 1 Black 108, 17 L.Ed. 35 (1861), a case in which the Supreme Court acknowledged that a freight lien can survive the delivery of the cargo in appropriate circumstances.

Spartan has submitted additional documentation detailing the fracturing of its relationship with P & M Brick and Coeymans Recycling. Among other things, Spartan's submissions detail its belief that these entities repeatedly tried to take advantage of a complicated situation by breaching certain written agreements they executed with Spartan. Whether or not Spartan's accusations are accurate, they do little to help answer the limited question presented here; i.e., whether or not Norden's discharge of part of the Cargo prior to April 6 was unconditional. If anything, this additional evidence would suggest it was not-Norden would likely want to hold tight to its maritime lien under these uncertain circumstances to ensure it could recoup any losses arising from further delays.