**LINEA NAVIERA DE CABOTAJE, C.A., Plaintiff,**

v.

**MAR CARIBE DE NAVEGACION, C.A., Defendant.**

No. 3:99–CV–471–J–25C.

United States District Court, M.D. Florida, Jacksonville Division.

May 7, 2001.

James Francis Moseley, Jr., Moseley, Warren, Prichard & Parrish, Jacksonville, FL, Don P. Murnane, Jr., Freehill, Hogan & Mahar LLP, Peter J. Gutowski, Freehill, Hogan & Mahar LLP, New York, NY, for Linea Naviera De Cabotaje C.A., plaintiffs.

Courtney W. Stanton, Thomas Corley Smith, Law offices of Courtney W. Stanton, Jacksonville, FL, for Mar Caribe De Navegacion, C.A., defendants.

## ORDER

ADAMS, District Judge.

Pending before the Court are various Motions. At a status conference held on August 23, 2000, the parties were optimistic that a joint stipulation of facts could be formulated from which the Court could resolve pending motions and the Court issued a Scheduling Order for such a stipulation. (Dkt.89). Like many good intentions, however, optimism may have been premature and the parties have apparently been unable to concur. Accordingly, the Court will examine the record before it.

There are three basic issues before the Court: a Motion to Compel Arbitration; a Motion to Dismiss on *forum non-conveniens* grounds; and an appeal from an Order of Magistrate Judge Timothy J. Corrigan denying a Motion to Strike Affidavit and Dissolve Attachments. (Dkt.69).

## I. Motion to Compel Arbitration

### A. Procedural History and Background

Linea Naviera De Cabotaje, C.A., (hereinafter "Linaca"), a Venezuelan business entity, owns the Venezuelan vessels M/V Cuidad Guayana and Cuidad Bolivar. According to the Complaint (Dkt.1), on or about September 7, 1998, Linaca entered into a maritime charter/contract of affreightment[1] with Mar Caribe De Navega-

---

1. "A time charter is a contract of affreightment to use a ship in order to ship goods for a specific period of time. The carrier makes the ship's capacity available to the time charterer for this purpose. The charterer bears

cion, C.A. (hereinafter "Mar Caribe"), also a Venezuelan business entity. The ships were to be used by Mar Caribe to ship bulk concrete clinker, iron ore and bauxite. Following eleven voyages between Venezuelan ports, during which approximately 90,000 metrictons of cargo were shipped, and at least partial payments were made by Mar Caribe to Linaca, financial disputes arose. Linaca, which was paid based on tonnage shipped, contends Mar Caribe did not ship the required minimum tonnage, resulting in under-shipment damages of $308,000.[2] Linaca also asserts demurrage[3] damages of $323,447.60. Additional sums, including advance arbitration expenses of $100,000, attorney fees, interest and costs are also requested, for a total of $840,748.08 claimed as of the date of the Complaint.

Linaca moves to compel arbitration,[4] to stay this action and to order Mar Caribe to appoint an arbitrator within three days of the Court's Order, failing which the Court is requested to appoint one. (Dkt.22). Mar Caribe contends there is no agreement to arbitrate.

The parties each signed separate agreements, each with an arbitration provisions. Neither party signed the other's version. Mar Caribe asserts: (1) there is no bilaterally executed agreement; therefore there is no agreement to arbitrate; (2) there is a threshold question—regardless of what the business arrangement was between the parties, it is illegal under Venezuelan law and therefore cannot be enforced; and (3) dismissal on *forum non conveniens* grounds is warranted, thus avoiding the arbitration issue at least in this forum.

Linaca and Mar Caribe each unilaterally executed separate charter party "agreements." While the Court has not gleaned all of the differences between the two versions (both of which are lengthy and replete with nautical technicalities), both versions list Linaca as ship owner, Mar Caribe as charterer, and the ships as the M/V Cuidad Guayana and Ciudad Bolivar. Both versions provide for arbitration in New York of **any** dispute arising under the charter, albeit on somewhat different terms. The version signed by Mar Caribe, the party resisting arbitration, provides for arbitration in New York with each party to appoint an arbitrator and if the two cannot agree, then the two would appoint an "umpire":

## CLAUSE 24: ARBITRATION

**ANY DISPUTE ARISING UNDER THIS CHARTER TO BE REFERRED TO ARBITRATION, IN NEW YORK WITH ONE (1) ARBITRATOR NOMINATED BY OWNERS AND ONE (1) ARBITRATOR**

---

the expenses connected with each voyage and pays hire to the carrier based upon the time the ship is under charter. An 'affreightment' is a contract with a ship-owner to hire a ship, or part of it, for the carriage of goods, and is generally in the form of either a charter-party or a bill of lading." *Hale Container Line, Inc. v. Houston Sea Packing Co., Inc.*, 137 F.3d 1455, 1461 n. 5 (11th Cir.1998) (citations omitted).

2. Magistrate Judge Corrigan held a telephonic hearing on May 21, 1999, to question counsel about the calculation of the claimed damages, interest and advance arbitration expenses. (Transcript of hearing, Dkt. 45).

3. Demurrage is liquidated damages to a ship-owner for the charterer's failure to load or unload cargo within certain time parameters—essentially damages for delay. BLACK'S LAW DICTIONARY 444 (7th ed.1999). The $323,447.60 in demurrage charges claimed are based on a $6,000.00 per day penalty clause. (Dkt.45).

4. Linaca had previously made demand on Mar Caribe to arbitrate. Although Linaca's Motion recites that Mar Caribe had no objection to arbitration, that mistaken belief was subsequently corrected (Dkt.27), and Mar Caribe has filed its Opposition to the Motion to Compel Arbitration. (Dkt.39).

NOMINATED BY CHARTERERS, AND IN CASE THE ARBITRATORS FAIL TO REACH AN AGREEMENT THEN THE DECISION OF AN UMPIRE TO BE APPOINTED BY THEM, THE AWARD OF THE ARBITRATORS AND/OR UMPIRE TO BE FINAL AND BINDING UPON BOTH PARTIES. IF EITHER OF THE APPOINTED ARBITRATORS REFUSED [SIC] TO ACT, OR IS UNCAPABLE [SIC] OF ACTING, OR DIES, THE PARTY WHICH APPOINTED SUCH ARBITRATION [SIC] MAY APPOINT A NEW ARBITRATOT [SIC] IN HIS PLACE.

IF ONE PARTY FAILS TO APPOINT AN ARBITRATOR, EITHER ORIGINALLY, OR BY WAY OF SUBSTITUTION AS AFORESAID, FOR SEVEN (7) CLEAR DAYS AFTER THE OTHER PARTY, HAVING APPOINTED ITSS [SIC] ARBITRATOR, HAS SERVED THE PARTY MAKING DEFAULT WITH NOTICE TO MAKE THE APPOINTMENT, THE PARTY WHICH HAS APPOINTED AN ARBITRATOR MAY APPOINT THAT ARBITRATOR TO ACT AS SOLE ARBITRATOR IN THE REFERENCE AND HIS AWARD SHALL BE BENDING [SIC] ON BOTH PARTIES AS IF HE HAD BEENN [SIC] APPOINTED BY CONSENT.

THIS CHARTER PARTY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH ENGLISH LAW.

(Mar Caribe's Opposition to Motion to Compel Arbitration, Dkt. 39. Exh. 3, unnumbered 4, emphasis supplied). This clause does not appear in the form portion of the contract, but in a specific four page addendum entitled "Rider Clauses," tailored to this charter party, typed in large font, each page separately signed by Mar Caribe.

Linaca's version also provides for arbitration in New York with each party to select an arbitrator. The two selected would chose a third and the decision of two out of three would be binding:

### CLAUSE 23: ARBITRATION

**Should any dispute arise out of this Charter, the Matter in dispute shall be referred to three persons at New York,** one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for purpose of enforcing any award, this agreement may be made a rule of the court. This Charter shall be governed by the Federal Maritime Law of the United States. (General Maritime Law of the United States.) The proceedings shall be conducted in accordance with the rules of the Society of Maritime Arbitrators Inc.

Notwithstanding anything contained herein to the contrary should the sum claimed by each party not exceed US$ 50,000.00 (U.S. dollars fifty thousand with 00/100), the dispute is to be governed by 2 shortened Arbitration Produce [sic] of the Society of Maritime Arbitrators Inc.

(Affidavit of James F. Moseley, Jr., Dkt. 24, Exh. A, unnumbered 13, emphasis supplied).

### B. Legal Principles and the Court's Conclusions

■■■ Under the Federal Arbitration Act, 9 U.S.C. §§ 2 & 4, "[a] written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction" is "valid, irrevocable, and enforceable" and upon petition to any federal district court, "upon being satisfied that the making of the agreement for arbi-

tration... is not in issue [the court]... shall make an order directing the parties to proceed to arbitration...." Nevertheless, the Act does not require parties to arbitrate when they have not agreed to do so. "It simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms." *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 478, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989). "The purpose of the Federal Arbitration Act was to relieve congestion in the courts and to provide parties with an alternative method for dispute resolution that would be speedier and less costly than litigation." *Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434, 1440 (11th Cir.1998). The Act demonstrates a "liberal federal policy favoring arbitration agreements." *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 121 S.Ct. 513, 522, 148 L.Ed.2d 373 (2000); *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). Accordingly, "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). Generally, "the parties' intentions control, but those intentions are generously construed as to issues of arbitrability." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). While an agreement to arbitrate must be in writing, there is no requirement that the writing be signed.[5]

*Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 845–46 (2nd Cir.1986). *See Valero Refining, Inc. v. M/T Lauberhorn*, 813 F.2d 60, 62 (5th Cir.1987)("It is established that a party may be bound by an agreement to arbitrate even in the absence of his signature"); *Medical Dev. Corp v. Indus. Molding Corp.*, 479 F.2d 345, 348 (10th Cir.1973)("Decisions under the Federal Arbitration Act ... have held it not necessary... that a party sign the writing containing the arbitration clause"); *Western Int'l Media Corp. v. Johnson*, 754 F.Supp. 871, 873 (S.D.Fl.1991).

The foregoing written provisions and signatures of the parties are not disputed. The determination of whether or not these written provisions evince an agreement to arbitrate is a question of federal law. U.S.C. Title 9; *Prima Paint Corp. v. Flood & Conklin Mfg.*, 388 U.S. 395, 403–404, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). For the purpose of determining whether the parties agreed to arbitrate, the arbitration provisions are severed from the balance of the disputed business relationship between these parties. *Id.* The Court determines that despite some differences in the contracts signed by the respective parties, there was consensus about arbitration. Although differing in detail, both documents agree to arbitrate disputes arising out of the charter arrangement in New York. Mar Caribe's version provides that "any dispute" arising out of the charter agreement is to be referred to arbitration in New York before two arbitrators, one selected by each party. If the two arbitrators can-

---

**5.** 9 U.S.C. § 3 provides:

If any suit or proceedings be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to

arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

not reach agreement, they select an "umpire." "The award of the arbitrators and/or umpire to be final and binding upon both parties." Linaca's version provides that "any dispute" arising out of the charter agreement is to be referred to three arbitrators in New York—one selected by each of the parties and a third selected by the first two with a vote of two out of three binding. Procedural differences in the respective provisions are insufficient to negate the separate yet unequivocal intention of both parties to arbitrate. Variance between the two arbitration provisions is an "ancillary logistical concern" which is not integral to the underlying agreement, and does not preclude arbitration. *Brown v. ITT Consumer Fin. Corp.*, 211 F.3d 1217, 1222 (11th Cir.2000). "[T]he dominant intent [in both arbitration clauses] was to arbitrate, with the machinery of selection of the arbitrators subordinate and incidental." *Lory Fabrics, Inc. v. Dress Rehearsal, Inc.*, 78 A.D.2d 262, 434 N.Y.S.2d 359 (1980), citing *Delma Eng'g Corp. v. K & L Constr. Co.*, 6 A.D.2d 710, 174 N.Y.S.2d 620 (N.Y.App.Div.), *aff'd*, 5 N.Y.2d 852, 181 N.Y.S.2d 794, 155 N.E.2d 675 (N.Y.1958). *Accord, Jones Apparel Group, Inc. v. Printsiples Fabrics Corp.*, 1986 WL 4703 at *3 (S.D.N.Y.1986)(finding separate written arbitration provisions were "sufficiently consistent that an agreement to arbitrate is readily found.... [I]t is for the arbitrators to resolve whatever substantive conflicts may be material to the dispute"); *Peters Fabrics, Inc. v. Jantzen, Inc.*, 582 F.Supp. 1287, 1291 (S.D.N.Y.1984)(compelling arbitration and noting that differences in arbitration clauses were "not sufficient to negate the unequivocally expressed intent of both parties to submit disputes to arbitration"); *Hill's Pet Nutrition, Inc. v. Fru–Con Constr. Corp.*, 101 F.3d 63, 65 (7th Cir.1996)(compelling arbitration where parties each signed draft agreements with an arbitration clause and began to perform

the contract). *Cf., Lea Tai Textile Co., Ltd. v. Manning Fabrics, Inc.*, 411 F.Supp. 1404, 1406–07 (S.D.N.Y.1975)(denying petition to compel arbitration where arbitration clauses were in "hopeless conflict").

As further evidence that Mar Caribe agreed to arbitrate these disputes and arbitrate them in New York, Mar Caribe's broker previously demanded that Linaca arbitrate these disputes in New York. On May 12, 1999, Guantas, Mar Caribe's broker, sent Linaca a written demand that these disputes be arbitrated in New York, named an arbitrator and requested Linaca appoint its arbitrator within the seven day time period specified in the arbitration clause in the agreement signed by Mar Caribe. (Affidavit of Peter Gutowski, Dkt. 50, ¶¶ 8, 14 & 15 & Exh. B).

Furthermore, the breath of the parties' arbitration clauses encompasses their current financial disputes. Both clauses provide for arbitration of "any" disputes arising out of the charter agreement. Whether or not required tonnage was shipped and other compensation issues are questions directly arising out of the agreement between the parties, whatever it is. The Court rejects Mar Caribe's assertion that the limitation of its arbitration language to disputes arising out of "this charter" presupposes resolution of the underlying issue of what constitutes the charter. Mar Caribe does not deny its signature on its version of the charter party agreement and that its subject is "the same generally defined transaction" as in the version signed by Linaca (Dkt.39, p. 2), although "[t]here are important differences between the two as to the respective rights and obligations of Linaca and Mar Caribe under each." *Id.* Although each party was apparently traveling under their respective contracts, their disputes, as well as their claims and

defenses, arise therefrom. If resolution of these disputes includes determining the remaining terms of the underlying contract between the parties, so be it. Whether or not those rights and obligations may be modified by subsequent events does not negate their genesis in the agreement Mar Caribe signed. The substantive differences in the signed charter agreements concern the total quantity Mar Caribe agreed to supply and whether shipments were to be continuous so that time gaps would count as demurrage. Regardless of what the shipping terms were, both sides agreed to arbitrate in New York. Thus, whatever the differences in the respective versions of the agreements as to the underlying substantive dispute, the parties each clearly agreed to arbitrate disputes arising out of that relationship in New York. Despite substantive differences in provisions other than arbitration, the writings concur on arbitration, a consensus that will be enforced. *Jones Apparel Group, Inc. v. Printsiples Fabrics, supra,* at *3. Mar Caribe's citation to *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) is *in apropos. First Options of Chicago* held that absent agreement to the contrary, the question of whether a party agreed to arbitrate would be determined judicially. This Court is making that determination.

While Section 4 of the Federal Arbitration Act directs the court to conduct an evidentiary hearing when the existence of an arbitration agreement is in dispute, no evidentiary hearing is necessary here because, while some contractual details may be disputed, the Court has determined from the factual record before it that there was consensus about arbitration. *U.S. Ti-*

*tan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.,* 16 F.Supp.2d 326, 337 n. 12 (S.D.N.Y.), *opn. withdrawn in part on other grounds,* 182 F.R.D. 97 (S.D.N.Y.1998).

Submitting the claims to arbitrators is just what the parties legitimately contemplated, and conforms to strong federal policy to liberally apply arbitration provisions. Accordingly, the parties are compelled to arbitrate in New York.[6] While the parties may otherwise agree, absent agreement, arbitration shall be conducted pursuant to Mar Caribe's arbitration clause, with two arbitrators, one selected by each party and an "umpire" (the term used in Mar Caribe's arbitration clause to denote a third arbitrator) if necessary. The arbitrators may select other procedural guidelines. While the Court will entertain any matters pertaining directly to the attachments, this action is otherwise stayed pending arbitration.

## II. *Forum Non Conveniens*

Mar Caribe also asserts that rather than arbitrate or even address the arbitration question, this matter should be dismissed on *forum non conveniens* grounds, deferring to Venezuela as the more convenient forum. In support, Mar Caribe points out that the only contacts with the United States are the fact that the two arbitration clauses call for arbitration in New York and the fact that Mar Caribe has at least one bank account in Jacksonville, Florida. In contrast, Mar Caribe states that Linaca and Mar Caribe are Venezuelan entities; voyages were between Venezuelan ports; litigation has allegedly been commenced in Venezuela seeking a declaration that the agreement between the parties (whatever that may be) is void under Venezuelan law.

---

**6.** The Court may compel the parties to arbitration in New York. 9 U.S.C. § 206 provides in pertinent part: "A court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States."

Mar Caribe also avers that it is amenable to process in Venezuela and Venezuelan courts are competent to handle this litigation and fully resolve all issues which this Court cannot, Mar Caribe argues, because it lacks jurisdiction. Mar Caribe also argues witnesses reside elsewhere, applicable law is foreign, and in balance, dismissal is warranted.

Linaca vigorously contests the adequacy of Venezuela as an adequate forum, stating the Venezuelan judiciary and legal system are in complete disarray following the "peaceful revolution" of President Hugo Chavez and asks the Court to take judicial notice of recent news articles of corruption and bribery in the Venezuelan judicial system.[7] In the alternative, Linaca requests a hearing on the adequacy of Venezuela as a forum.

■ The Court has discretion to dismiss on *forum non conveniens* grounds after considering relevant public and private policies. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 257, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). Although there is a strong presumption in favor of plaintiff's choice of forum, the presumption applies with less force when the plaintiff is foreign. *Piper Aircraft*, 454 U.S. at 255–56, 102 S.Ct. 252. The moving party must demonstrate: (1) that an adequate alternative forum is available; and (2) that private and public interest factors weigh in favor of dismissal. *Republic of Panama v. BCCI Holdings (Luxembourg)*, 119 F.3d 935, 951 (11th Cir.1997).

The Eleventh Circuit has articulated guidelines:

As a prerequisite, the court must establish whether an adequate alternative forum exists which possesses jurisdiction over the whole case. Next, the trial judge must consider all relevant factors of private interest, weighing in the balance a strong presumption against disturbing plaintiffs' initial forum choice. If the trial judge finds this balance of private interests to be in equipoise or near equipoise, he must then determine whether or not factors of public interest tip the balance in favor of a trial in a foreign forum. If he decides that the balance favors such a foreign forum, the trial judge must finally ensure that plaintiffs can reinstate their suit in the alternative forum without undue inconvenience or prejudice.

*La Seguridad v. Transytur Line*, 707 F.2d 1304, 1307 (11th Cir.1983)(emphasis omitted).

■ Ordinarily, the requirement of an adequate foreign forum is met where, as here, the defendant is amenable to process in the other jurisdiction. *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 506–07, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). A forum is considered inadequate only if "the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all." *Piper Aircraft*, 454 U.S. at 254 & n. 22, 102 S.Ct. 252. However, "[i]t is not the business of our courts to assume responsibility for supervising the integrity of the judicial system of another sovereign nation.'" *Banco Latino v. Gomez Lopez*, 17 F.Supp.2d 1327, 1332 (S.D.Fla.1998)(concluding Venezuela was an adequate forum, citing *Blanco v. Banco Indus. de Venezuela, S.A.*, 997 F.2d 974, 982 (2nd Cir.1993)). *See also Aquamar, S.A. v. Del Monte Fresh Produce, N.A., Inc.*, 179 F.3d 1279, 1288 n. 19 (11th Cir.1999)(noting Ecuador was an adequate alternative forum) and *Republic of Panama*, 119 F.3d at 951 (rejecting claims that Cayman Islands, England and Luxembourg were not adequate fora because they

---

7. The Affidavit of Peter J. Gutowski attests to these assertions (Dkt.50, pp. 10–13, Exhs.E– K) and is the subject of Mar Caribe's Motion to Strike.

would not entertain civil RICO claims). Accordingly, the Court finds that Venezuela is not an inadequate forum.

The next element, consideration of private concerns, includes matters such as ease of access to evidence, availability of compulsory process for obtaining witnesses, the relative cost of doing so, and other practical trial concerns. *Gulf Oil Corp. v. Gilbert*, 330 U.S. at 507–08, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). Thus, in *Magnin v. Teledyne Continental Motors*, 91 F.3d 1424, 1429–30 (11th Cir.1996), witnesses to a plane crash all lived in France as did the owner of the plane and French substantive law would be applied. Citing many of the public and private factors outlined above, the action was dismissed on *forum non conveniens* grounds. However, as set forth herein, many of these concerns attendant that accident and resultant negligence claims simply do not apply in this maritime case. Assertions of witness convenience and availability of evidence tip the scales slightly in favor of a Venezuelan forum, but are not dispositive in view of the expressed willingness of both parties to resolve their disputes in New York. New York is the bargained for forum of both parties. The Court can resolve the arbitration question without resort to additional evidence and neither party has suggested the need for additional evidence from Venezuela or elsewhere. Indeed the parties have submitted Venezuelan witness testimony via affidavit in connection with the motions now pending before the Court. Therefore, private concerns do not prevent this Court from addressing the arbitration question.

Consideration of public factors, the next element, includes the sovereign's interest in deciding the dispute, administrative burdens posed by trial and the forum's interest in applying foreign law. *Gulf Oil Corp. v. Gilbert*, 330 U.S. at 508–09, 67 S.Ct. 839. These factors recognize "a local interest in having localized controversies decided at home" and the appropriateness of litigation "at home with the . . . law that must govern the case." 330 U.S. at 509, 67 S.Ct. 839. These public concerns do not alter the Court's conclusions.

Forum non-conveniens and arbitration are simply two divergent concepts. By agreeing to arbitrate in New York, Mar Caribe waived its *forum non-conveniens* arguments. Presumably convenience was considered in choosing arbitration in New York (as well as opening bank accounts in Jacksonville, Florida). These were volitional decision by Mar Caribe which militate against Mar Caribe's current protestations. The integrity of the parties' agreement to arbitrate any disputes in New York trumps Mar Caribes' complaints of inconvenience.

The Court recognizes that here there are significant contacts outside the forum and indeed the nation; however, that does not end the Court's inquiry. This action commenced with Linaca's attachment and garnishment of Mar Caribe's bank accounts pursuant to Supplemental Rule B of the Federal Rules of Civil Procedure. Supplemental Rule B is premised on limited contacts with the forum and authorizes garnishment of assets of a foreign or other entity **only** if that entity cannot otherwise be found in the forum. Accordingly, limited contact with the forum and inconvenience to the defendant are not only the norm but the prerequisite of Rule B. If Mar Caribe had a presence in this district, Linaca would not have been able to commence this Supplemental Rule B proceeding.

Rule B provides in pertinent part for garnishment of assets of a defendant "not found within the district:"

> [A]ny admiralty or maritime claim in personam . . . [may contain] a prayer for process to attach the defendant's goods

and chattels, or credits and effects in the hands of garnishees, ... **if the defendant shall not be found within the district.** (emphasis supplied). *See also* Rule 7.02 of the Local Rules of the Middle District of Florida ("a defendant shall be considered 'not found within the district' if he cannot be served within the Middle District of Florida with the summons and complaint"). Therefore, this action is here only because of Mar Caribe's limited contact with the forum. That is simply the nature of the proceeding. Mar Caribe's requests to dismiss on the basis of convenience is not well taken.

■■■ Supplemental Rule B attachment has the dual purpose of obtaining security for the satisfaction of a judgment as well as obtaining personal jurisdiction over a defendant. *Swift & Co. Packers v. Compania Colombiana Del Caribe*, 339 U.S. 684, 693, 70 S.Ct. 861, 94 L.Ed. 1206 (1950); *Venus Lines v. CVG Industria. Venezolana De Aluminio*, 210 F.3d 1309, 1312 (11th Cir.2000), citing *Nehring v. Steamship M\*V Point Vail*, 901 F.2d 1044, 1051 (11th Cir.1990). "Under Supplemental Rule B, in personam jurisdiction over the defendant is obtained by compelling its appearance through attachment of its goods and chattels, or credits and effects." *Polar Shipping Ltd. v. Oriental Shipping Corp.*, 680 F.2d 627, 629 (9th Cir.1982), citing *Swift & Co. Packers*. By virtue of the Supplemental Rule B attachment of Mar Caribe's bank account, the Court has personal jurisdiction over Mar Caribe and may direct the parties to arbitrate. 9 U.S.C. § 8.[8] Therefore, Mar Caribe's assertion this Court lacks jurisdiction over the parties is incorrect.

Mar Caribe relies heavily on *Great Prize, S.A. v. Mariner Shipping Pty., Ltd.*, 967 F.2d 157 (5th Cir.1992) in arguing dismissal on *forum non conveniens* grounds is appropriate. *Great Prize* upheld a discretionary dismissal on *forum non conveniens* grounds where the parties were all foreign corporations and the only connection with the United States was the presence of fuel bunkers on a ship anchored at the mouth of the Mississippi River. In *Great Prize*, the Fifth Circuit held the trial court did not abuse its discretion in dismissing the action on *forum non conveniens* grounds where the only contact with the United States was the fortuitous presence of the ship. Weighing both private and public factors, the trial court concluded Australia was an adequate alternative forum and dismissed the action. While not clear from the opinion, it appears that the time charter agreement provided for arbitration in England. 967 F.2d at 160 n. 12. Mar Caribe argues this Court should likewise disregard the provisions for arbitration in New York and dismiss.

First of all, *Great Prize* is not binding on this Court; neither party has cited any Eleventh Circuit citation to this Court and none has been found. Secondly, *Great Prize* held the Court has discretion to dismiss on *forum non-conveniens* grounds, not that the court had to ignore the arbitration agreement and dismiss. Thirdly, *Great Prize* has been effectively overruled by the United States Supreme Court in *Vimar Seguros y Reaseguros, S.A. v. M/V SKY REEFER*, 515 U.S. 528, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995)

---

**8.** 9 U.S.C. § 8 provides:
   If the basis of jurisdiction be a cause of action otherwise justiciable in admiralty, then, notwithstanding anything herein to the contrary, the party claiming to be aggrieved may begin his proceeding hereunder by libel and seizure of the vessel or other property of the other party according to the usual course of admiralty proceedings, and the court shall then have jurisdiction to direct the parties to proceed with the arbitration and shall retain jurisdiction to enter its decree upon the award.

where the Court upheld arbitration in the forum designated by agreement despite claims of inconvenience. In *Skyreefer*, a Japanese arbitration clause was enforced despite claims of inconvenience to the New York fruit distributor whose produce was damaged in a Panamanian vessel transporting from Morocco to Massachusetts. *BREMEN v. Zapata Off-Shore Co.*, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972) upheld a forum selection clause despite claims of inconvenience. There the Supreme Court noted that advance concurrence on a forum acceptable to both parties "is an indispensable element in international trade, commerce and contracting." *BREMEN* at 13, 92 S.Ct. 1907. *See also Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991)(upholding Florida forum selection clause in a cruise ticket despite claims of inconvenience by residents of Washington).

Moreover, not only has *sky reefer* effectively eroded any precedential value of *Great Prize*, the Fifth Circuit has apparently retreated from *Great Prize* in *Mitsui & Co. (USA), Inc. v. Mira M/V*, 111 F.3d 33, 37 (5th Cir.1997) where, noting the international character of the parties and the transaction, the court, without mention of *Great Prize*, upheld the district court's enforcement of a foreign forum-selection clause,[9] reasoning "[i]ncreased cost and inconvenience are insufficient reasons to invalidate forum-selection **or arbitration clauses**," citing *SKY REEFER* (emphasis supplied). *Accord, Kanematsu USA, Inc. v. M/V Pretty Prosperity*, 2000 WL 943139 at \*2 (E.D.La. July 7, 2000)(citing *SKY REEFER* to uphold selection of Japan as

forum despite protests of inconvenience and increased costs).

The Fifth Circuit recently held that forum selection and arbitration clauses are presumptively valid.

Forum-selection clauses are presumptively valid: "A freely negotiated private international agreement, unaffected by fraud, undue influence, or overweening bargaining power should be given full effect." The burden of proving unreasonableness is a heavy one, carried only by a showing that the clause results from fraud or overreaching, that it violates a strong public policy, or that enforcement of the clause deprives the plaintiff of his day in court.

*Afram Carriers, Inc. v. Moeykens*, 145 F.3d 298, 301 (5th Cir.1998) (citation and emphasis omitted). *See Haynsworth v. The Corporation*, 121 F.3d 956, 963 (5th Cir.1997)(noting no distinction between foreign arbitration clauses and foreign forum selection clauses, holding that absent fraud or over-reaching specific to the foreign forum selection clause, it will be enforced). Moreover, the prior demand for New York arbitration by Mar Caribe's broker Guantas is strong evidence against Mar Caribe's claims of inconvenience, as well as of Mar Caribe's agreement to arbitrate, as noted *infra*.[10] Finally, Venezuelan courts would likely also enforce Mar Caribe's arbitration agreement, thus the end result would be arbitration in New York, whether ordered by this Court or a Venezuelan court.[11]

The very nature of Rule B assumes that the defendant cannot be found in the district. *Forum non conveniens* concerns do

---

**9.** Foreign arbitration clauses are a subset of foreign forum selection clauses in general. *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 519, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974).

**10.** While it is not clear from the record, arbitration did not proceed.

**11.** The arbitration clause in Mar Caribe's agreement calls for the application of the laws of England. There is no claim that English law would inadequately resolve these disputes.

not automatically trump either an agreement to arbitrate or Rule B. Supplemental Rule B attachment is premised upon and exists only if it is inconvenient. If complaints of inconvenience could remove an action from this forum, then the Rule would be rendered hollow. In this international business relationship, the arbitration/forum selection clause is prima facie valid and should be enforced. *Lipcon v. Underwriters at Lloyd's, London,* 148 F.3d 1285, 1291–92 (11th Cir.1998). Upon careful consideration and after weighing the foregoing public and private concerns, the Court denies Mar Caribes' request to dismiss this action on *forum non conveniens* grounds.

### III. Appeal from Magistrate Judge's Order on Motion to Strike Affidavit and Dissolve Attachments.

#### A. Procedural History and Background

Paragraph 14 of Linaca's Verified Complaint alleges that Mar Caribe has bank accounts in the forum and that Guantas Chartering, C .A. (hereinafter "Guantas") and Emprendedora Shipping, S.A. (Hereinafter "Emprendedora") also had local bank accounts which were assets of Mar Caribe because Mar Caribe's debts to Linaca had been paid from these accounts:

> Upon information and belief, the Defendant CHARTERER [Mar Caribe] cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but is believed to have, or will shortly have, assets within this District consisting of, *inter alia*, cash, funds, credits, and/or other assets in its account(s) and/or in the accounts of Guanta's Chartering, C.A. and/or Emprendedor Shipping maintained at First Union Bank, 170 North Hogan Street, Jacksonville, Florida 32202. The basis for this belief is that Defendant CHARTERER [Mar Caribe] has, on several instances in the past, made payment of monies owned [sic] to Plaintiff LINACA from the aforesaid Guanta's and Emprendedora accounts.

On May 21, 1999, and May 24, 1999, Linaca filed Motions for Garnishment and Attachment pursuant to Supplemental Rule B. (Dkt.3, 9). Following an *ex parte* hearing on May 21, 1999, Magistrate Judge Timothy J. Corrigan issued an Order attaching three accounts at First Union National Bank in Jacksonville, Florida—one in the name of Mar Caribe, one in the name of Guantas and one in the name of Emprendedora. First Union filed its Garnishee's Answer, representing it held the following: $56,479.34 in the Emprendedora account; $20,411.48 in the Guantas account; and $63,067.21 in the Mar Caribe account, for a total of $139,958.03.[12] (Dkt.12).

Guantas and Emprendedora filed Restricted Appearances [13] and Answers pursuant to Local Rule 7.02(a) [14] and moved to

---

**12.** Supplemental Rule 5(a) provides for release of attached security upon the posting of a bond. No such release has been requested.

**13.** Supplemental Rule E(8) provides for restricted appearances:

An appearance to defend against an admiralty and maritime claim with respect to which there has issued process in rem, or process of attachment and garnishment whether pursuant to these Supplemental Rules or to Rule 4(e), may be expressly restricted to the defense of such claim, and

in that event shall not constitute an appearance for the purposes of any other claim with respect to which such process is not available or has not been served.

**14.** Local Rule 7.02(e) governing post-attachment proceedings, provides in pertinent part:

(1) Filing a Required Answer: In accordance with Supplemental Rule (E)(4)(f), any person who claims an interest in property seized pursuant to Supplemental Rule (B) must file an answer and claim against the property. The answer and claim shall de-

dissolve the attachments on their accounts. (Dkts 20 & 30). They argued (1) Linaca had no right to attach their accounts because they are not parties to this action; and (2) the attachments were improper because the allegations of the Verified Complaint that payments were made from theses accounts for the benefit of Mar Caribe were facially insufficient to support attachment.[15] Their request for a hearing was granted by Magistrate Judge Corrigan. At the hearing and in pleadings Linaca offered additional evidence of interrelationship between the three entities. The additional evidence submitted by Linaca, some of which is contained in the Affidavit of Don Murnane (Dkt.38), about which Mar Caribe complains, consisted of the following:

(1) Supporting bank transfer documents showing payments in excess of $100,000 out of these accounts to Linaca with reference to the vessels Cuidad Guayana and Cuidad Bolivar;[16]

(2) Correspondence from Mar Caribe offering to settle this action by payment of all funds in all three accounts. This document was offered not for evidence of improper settlement negotiations, but as evidence of a common enterprise between these three entities and/or of Mar Caribe's dominion and control over these accounts. Fed.R.Evid. 408.

(3) Guantas, apparently thinking it was a principal and not a broker in the underlying charter arrangement, previously demanded arbitration of this dispute, seeking

a declaration of non-liability for the sums sought by Linaca.

(4) Guantas's Answer averred that disbursal from its account "was in settlement of debits owed Mar Caribe by Guanta's, and pursuant to specific directions in regard to the settlement of such debits." (Dkt.20, p. 6). Linaca argued that specific direction to pay funds out of another's bank account is a strong indicia of ownership interest in that account.

Guantas and Emprendedora moved to strike the Murnane Affidavit, arguing the Affidavit was "an improper attempt to establish after the fact probable cause" for the attachment and contained inadmissable evidence because (a) Mr. Murnane, who is counsel of record for Linaca, was not competent to testify as to the matters contained in the Affidavit; (b) the Affidavit contains inadmissable evidence; and (c) the legal conclusions contained therein are argumentative, making the Affidavit an additional legal memorandum prohibited by Local Rules.

Magistrate Judge Corrigan denied the Motion to Strike and concluded based on precedent and principles underlying the admiralty rules that, for the purposes of determining whether there was probable cause for the attachment, evidence may be considered at the post-attachment hearing that was not before the Court at the time of the original attachment order. Judge Corrigan also concluded that there was probable cause for the attachments and denied the motions to dissolve. (Dkt.69).

---

scribe the nature of the claimant's interest in the property, and shall articulate reasons why the seizure should be vacated.

**15.** The Court agrees with Magistrate Judge Corrigan's finding that whether these accounts were attached or garnished is a technical distinction that does not alter the substance of either the Court's analysis or conclusions.

**16.** It appears from these bank transfer documents that $127,622.25 was paid out of Guantas's First Union Bank account on one occasion and $137,171.56 on another—both to Linaca. $100,000.00 was paid to Linaca from Emprendedora's account. (Affidavit of Don Murnane, Dkt. 38, Exh. B).

Guantas and Emprendedora appealed. (Dkt.79).

## B. Legal Principles and the Court's Findings and Conclusions

Rule 72(a) of the Federal Rules of Civil Procedure permits a party, within ten (10) days of being served with a copy of a Magistrate Judge's Order, to file objections to that Order. In accordance with 28 U.S.C. § 636(b)(1)(A) [17] and Rule 72(a), upon review, any portion of the Magistrate Judge's Order found to be clearly erroneous or contrary to law may be set aside or modified. The United States Supreme Court has defined the clearly erroneous standard as follows:

A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

*Pullman–Standard v. Swint,* 456 U.S. 273, 285 n. 14, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982), citing *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

Maritime attachment under Supplemental Rule B(1) [18] permits an admiralty claimant to attach assets of a defendant located in the district as well as the defendant's credits or effects in the hands of garnishees located in the district. This unique maritime attachment is available only if the defendant cannot be *found* in the district.[19] Supplemental Rule B provides in pertinent part for an *ex parte* judicial determination that grounds for attachment appear to exist.[20] "The verified complaint and affidavit shall be reviewed by the court and if the conditions set forth in this rule **appear to exist**, an order stating and authorizing process of attachment and garnishment shall issue." Under Local Admiralty Rule 7.02(c)(1), judicial review of the attachment or garnishment request is whether there is "probable cause" to attach:

[A] judicial officer shall first review the verified complaint, and any other relevant case papers, prior to the Clerk

---

**17.** 28 U.S.C. § 636(b)(1) provides:

Notwithstanding any provision of law to the contrary -

(A) a judge may designate a magistrate to hear and determine any pretrial matter pending before the court, except a motion for injunctive relief, for judgment on the pleadings, for summary judgment, to dismiss or quash an indictment or information made by the defendant, to suppress evidence in a criminal case, to dismiss or to permit maintenance of a class action, to dismiss for failure to state a claim upon which relief can be granted, and to involuntarily dismiss an action. A judge of the court may reconsider any pretrial matter under this subparagraph (A) where it has been shown that the magistrate's order is clearly erroneous or contrary to law.

**18.** Supplemental Rule B(1) provides in part that the Complaint may contain a request to attach "the defendant's goods and chattels, or credits and effects in the hands of garnishees."

**19.** Whether a defendant can be "found within the district" is a two-pronged inquiry developed in construing former Admiralty Rule 2, the predecessor to Supplemental Rule B. The analysis is: " 'first, whether [the defendant] can be found within the district in terms of jurisdiction, and second, if so, whether it can be found for service of process.' " *Nehring v. Steamship M/V Point Vail,* 901 F.2d 1044, 1051 n. 6 (11th Cir.1990) (citation omitted). *See* Local Rule 7.02(a).

**20.** According to the Federal Rules Advisory Committee Notes (1985): "[t]he rule envisions that the order will issue when the plaintiff makes a prima facie showing that he has a maritime claim against the defendant in the amount sued for and that the defendant is not present in the district." The Rule was amended in 1985 to provide for judicial scrutiny before the issuance of attachment or garnishment in order to alleviate concerns about the constitutionality of the Rule.

issuing the requested process of attachment and garnishment. No notice of this pre-arrest judicial review is required to be given to any person or prospective party.

If the Court finds that probable cause exists to issue the process of attachment and garnishment, plaintiff shall prepare an order for the Court's signature directing the Clerk to issue the process.

While no notice of the request for attachment is required, subsequently, "any person" is entitled to "a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated." Supplemental Rule E(f) governs post-attachment hearings and provides in pertinent part:

*Procedure for Release From Arrest or Attachment.* Whenever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which **the plaintiff shall be required to show why the arrest or attachment should not be vacated** or other relief granted consistent with these rules. (Emphasis supplied).

Similarly, Local Rule 7.03(g) provides for a show cause hearing at which the plaintiff must show cause why the arrest or attachment should not be vacated. Local Rule 7.02(e)(2) grants a right to a hearing within three days.

As quoted above, Linaca's Verified Complaint proffered that Mar Caribe could not be "found" in the district (a finding that Mar Caribe does not contest), and that debts of Mar Caribe to Linaca had previously been paid from Guantas and Emprendedora bank accounts. On this basis Magistrate Judge Corrigan issued the attachment. Based in part on additional evidence subsequently adduced, Judge Corrigan denied the motions to dissolve the attachments.

Guantas and Emprendedora argue that the propriety of the attachment must be measured only by the evidence that was before Judge Corrigan at the time of the initial attachment and that subsequent evidence cannot bolster that initial determination.

[P]robable cause must exist for an attachment at the time a warrant of attachment issues. Consequently, the issue was not whether probable cause existed at the time of the hearing sufficient to permit the attachments to continue, but rather whether there had been probable cause to issue in the first instance the order of attachment, which can only be determined from the record before the Court at the time it issued the order. At that time the only evidence presented to the reviewing magistrate was a claim in the verified complaint that on several occasions checks drawn on the accounts of the intervening claimants had been used by Mar Caribe to pay Linea monies that Mar Caribe owned Linea. Emprendedora and Guantas asserted that this allegation falls short of alleging that their accounts were 'goods or credits of Mar Caribe in the hands of First Union'.

(Joint Objection of Guantas and Emprendedora, Dkt. 79, pp. 6–7).

Guantas and Emprendedora also assert that if the post-attachment hearing is not limited to review of the sufficiency of the evidence initially presented, then the constitutionality of this procedure is suspect. They argue that is the decision to issue the writ can be justified by post-attachment evidence, then there is no mechanism for an adversely affected person to test the sufficiency of the initial determination and the value of the hearing as an instrument of due process is lost.

For the hearing on the validity of the attachment order, Guantas and Emprendedora filed the Unsworn Declaration of Aurelio Fernández–Concheso (Dkt. 33, Exh. Two; Dkts. 35 & 36). In part, the Declaration explains that a $100,000 payment to Linaca from Emprendedora's account was a loan to Mar Caribe necessitated by cash-flow problems and was repaid by Mar Caribe one day later. Admittedly a number of payments were made thereafter from Guantas' account, but they were made in Guantas' capacity as ship broker according to the Declaration. The Declaration also opines that under Venezuelan law, each of these three entities is separate, insulated from liability for another's debts and that "moral violence" (illegal competition) in the negotiation of the "attempted" contract rendered it void under Venezuelan law.

In response to the request to dissolve the attachments, Linaca argues first that the Verified Complaint alone sufficiently supported (and supports) the attachment and, secondly, that Magistrate Judge Corrigan did not err in relying on additional evidence in the post-attachment evidentiary record.

First, as to the sufficiency of the initial attachment and garnishment, the Complaint was verified by local counsel for Linaca, based on statements and documentation furnished to him by Linaca's President. As provided for in Rule B, Magistrate Judge Corrigan conducted an *ex parte* hearing on Linaca's motion for attachment and garnishment on May 21, 1998.[21] (Transcript, Dkt.45). Cautioning counsel that he would afford prompt hearings as to the propriety of the attachment, Magistrate Judge Corrigan issued an Order Directing Issuance of Process of Attachment and Garnishment.

Upon review by the undersigned, the Magistrate Judge's thoughtful Decision to consider additional evidence at the post-attachment hearing and to deny the motions to dissolve the attachment is neither clearly erroneous nor contrary to law.[22] At the post-attachment hearing, Linaca had the burden of establishing probable cause for the attachment. *20th Century*

**21.** At the time of the initial attachments, "Linaca provided the Court with evidence that it had received payments on behalf of Mar Caribe from Emprendedora's and Guantas' accounts." (Judge Corrigan's Order, Dkt. 69, p. 12). In the Transcript of the *ex parte* hearing, Magistrate Judge Corrigan expressed comfort with the legal grounds for the issuance of the writ of attachment, but questioned damage calculations. (Transcript, Dkt.45). Counsel for Linaca explained the $323,447.60 in claimed demurrage damages as—"a function of the period of time the vessel stayed either waiting or discharging beyond the window of lay time for each individual voyage." *Id.*, p. 4. Counsel proffered that in addition to demurrage damages, less than minimum tonnage was shipped during the eleven voyages for a total short-shipment of 88,000 tons which, times $3.50 per ton profit figure, computes to lost profits of $308,000. Magistrate Judge Corrigan also questioned about the interest amount claimed. Counsel explained that interest at the rate of 9%, the New York state rate, was used for a two year period. *Id.*, p. 9. Counsel explained the $100,000 advance arbitration expense component of claimed damages as based upon "the number of hearings in the case, the possible need for experts, our estimate of what the arbitrators would charge, an allowance against legal fees [at New York rates]—not what we anticipated would be the full bill—the cost of the hearing, the transcript pages and everything, we came up with that estimate." *Id.*, p. 10.

**22.** Judge Corrigan rejected arguments that the Murnane Affidavit should be stricken because (1) it was not based on personal knowledge; (2) it contained hearsay, and (3) was an additional legal memorandum prohibited by the Local Rules. (Order, Dkt. 69, p. 4 n. 9). Citing *Salazar*, 881 F.2d at 80, Judge Corrigan concluded a Rule E post-attachment hearing is an informal proceeding in which the Court can exercise discretion to consider affidavits and legal memoranda.

*Fox Film v. M.V. Ship Agencies, Inc.,* 992 F.Supp. 1423, 1427 (M.D.Fla.1997)(questioning without deciding whether the probable cause determination is limited to evidence before the Court at the initial attachment or to evidence presented at post-attachment hearing because under either standard, there was requisite probable cause). Supplemental Rule E does not restrict review to the adequacy of the allegations in the complaint, nor does it echo the standards of the initial attachment that conditions *appear to exist;* rather Rule E requires plaintiff (Linaca) show why the attachment should not vacated.

Under Rule E(4)(f), the plaintiff must show that reasonable grounds exist for the arrest and attachment and that it should be maintained. A Rule E(4)(f) hearing is not intended to definitely resolve the dispute between the parties, but only to make a preliminary determination of whether there are reasonable grounds for issuance of the arrest warrant, and if so to fix an appropriate bond.

*North of England Protecting and Indem. Assoc., Ltd. v. M/V Nara,* 1999 WL 33116416 (E.D.La.1999), citing *20th Century Fox Film Corp., supra.*

In determining whether there are reasonable grounds for the attachment and it should be maintained under Rule E(4)(f), the Court has the discretion to consider additional evidence at the post-attachment hearing. *Salazar v. Atlantic Sun,* 881 F.2d 73, 79 (3rd Cir.1989):

The Supplemental Admiralty Rules do not specify what form the post-arrest hearing must follow. Consequently, the type of proceeding is left to the discretion of the district court. Whether a full adversary hearing with testimony and cross-examination of witnesses in open court is necessary depends on the nature of the issues in controversy.

*Accord, Lion de Mer, S.A. v. M/V Loretta D,* 1998 WL 307077 at *2 (D.Md.1998).

As noted by Judge Corrigan, several courts have considered extrinsic evidence in post-attachment and post-vessel arrest proceedings.[23] *Cont. Ins. Co. v. Adriatic Tankers Shipping Co.,* 1995 WL 649942 at *1 (E.D.La.1995)(considering affidavit in determining probable cause for arrest); *Ocean Marine Mut. Ins. Ass'n Europe O.V. v. M/V Lia,* 1999 WL 679671 at *1 (E.D.La.1999)(explaining that in a Rule E(4)(f) post-seizure hearing, the "plaintiff must come forward with evidence sufficient to show probable cause for the arrest"); *A. Coker & Co. v. Nat'l Shipping Agency Corp.,* 1999 WL 311941 (E.D.La.1999)(considering evidence submitted at post-arrest hearing as to asserted corporate alter-egos, concluding that while alter-egos had not been definitively determined, there was sufficient probable cause to support the arrest of bunkers aboard a ship despite claims of competing ownership); *Mujahid v. M/V Hector,* 948 F.2d 1282 (Table), 1991 WL 254121 at *1 (4th Cir.1991)(unpublished)(concluding the trial court did not err in considering evidence submitted at the post-arrest hearing). *See also, Madredeus Shipping Co., Ltd. v. Century Bridge Chartering Co., Ltd.,* 2000 WL 1344101 (S.D.Fla., Feb.11, 2000)(noting that inquiry at hearing challenging Supplemental Rule B attachment is on facts known at time of attachment, yet considering additional evidence submitted a evidentiary hearing); *Casper Marine, Inc. v. Seatrans Shipping Corp.,* 969 F.Supp. 395, 396 (E.D.La.1997)(relying in part on unsworn declaration submitted at

---

**23.** Under Supplemental Rule E(4)(f) the same standard applies to release of either arrested or attached property.

post-attachment hearing to deny dissolution of the attachment).

The Court is not persuaded by Mar Caribe's citation to *Transamerica Leasing, Inc. v. Amazonica,* 1997 WL 834554 (S.D.Ala.1997) and *Western Bulk Carriers v. P.S. Int'l.,* 762 F.Supp. 1302, 1308–09 (S.D.Ohio 1991). In both of these cases, the courts focused on the defendants' "presence" in the district as of the time of the initial attachment, declining to dissolve the attachment because of defendant's post-attachment defense maneuvers to facilitate service of process in the district which would destroy one of the pre-requisites to Supplemental Rule B attachment. The element of defendant's presence in the district (which a defendant could control post-attachment would emaciate the Rule) is a different inquiry from whether an attachment should continue and/or was appropriately issued in the first instance.

■■■ In seeking reversal of Judge Corrigan's Order, Guantas and Emprendedora urge the Court to analogize to probable cause in a criminal context which is determined as of the date of the arrest or search as opposed to subsequently such as in a suppression context when additional support may have developed. Constitutional differences aside, concepts of criminal probable cause and pre-judgment attachments are not analogous.

Neither is the Court persuaded by claims of due process violation. While the initial attachment was issued *ex parte,* claimants had a right to a hearing in three days at which they had opportunity to present whatever they wanted. As Judge Corrigan explained:

> Rule B offers protection to a defendant/property owner by requiring the plaintiff to produce a *verified* complaint supporting the attachment and an affidavit attesting that the defendant cannot be found within the district. The Court's role at this point is to determine whether there is probable cause for the attachment. Given the potentially urgent nature of the situation, a plaintiff may not be able at that time to produce all of the evidence available to support the attachment. The plaintiff must simply produce enough evidence to convince the court there are reasonable grounds to "stop the ship." If the court finds probable cause, the defendant/property owner is entitled to an immediate post-attachment hearing, which must occur no later than three days from the defendant's request.

(Judge Corrigan's Order on Motion to Dissolve Attachments, Dkt. 69, p. 11) (citations omitted)..

Denying the request to dissolve the attachments, Judge Corrigan noted allegations in the Murnane Affidavit were evidence of Mar Caribe's dominion and control over all three accounts and their commonality. While not considering the settlement offer as evidence of liability, Judge Corrigan also cited Mar Caribe's offer to settle this dispute by payment of all three account balances as at least "some evidence that Mar Caribe controls or at least has a property interest in the funds in the Guantas and Emprendedora accounts." (Order, Dkt. 69, at 12). Judge Corrigan also cited Guantas' prior arbitration demand as evidence of interrelationship and liability for Mar Caribe's debts, and noted Guanta's statement that funds were paid at Mar Caribe's "specific direction" was indicative of Mar Caribe's control over these accounts, suggesting they were Mar Caribe's "goods and chattels" subject to Supplemental Rule B attachment. Finally, Judge Corrigan noted that all three entities have the same Venezuelan address and are represented by the same counsel in these proceedings. While characterizing Linaca's evidence as not conclusive, and recognizing that the deci-

sion to continue the attachments was not a final determination of commonality and control between the three entities, Judge Corrigan concluded that the attachment was supported by probable cause.

However, regardless of whether the Court is limited to a review of the initial pleadings, conditions for the attachments of Guantas and Emprendedora appeared to exist at the time of the initial attachment; therefore, "there was and is probable cause for the attachment." *20th Century Fox*, 992 F.Supp. at 1427. Judge Corrigan's Order was neither clearly erroneous nor contrary to law.

Accordingly, it is **ORDERED**:

1. The Motion of Defendant Mar Caribe for Reconsideration of this Court's Scheduling Order, (Dkt.94), is **GRANTED** to the extent set forth herein. .

2. Mar Caribe's Request for Oral Argument on its Motion for Judgment on its Forum Non Conveniens Defense (Dkt.34), is **DENIED**.

3. Linaca's Motion for Stay of Proceedings, to Compel Arbitration and to Appoint Arbitrator (Dkt.22), is **GRANTED** in part and **DENIED** in part. The parties are ordered to arbitration in New York pursuant to Clause 24 of the charter party agreement dated September 10, 1998 signed by Mar Caribe. The arbitrators will determine the disputes between the parties including contractual terms. This action is **STAYED**. Linaca and Mar Caribe shall each appoint their respective arbitrators within **TEN (10) DAYS** from the date of this Order. The Court retains jurisdiction to enforce any arbitration award; the attachment and garnishment remain in force, subject to seek release under Supplemental Rule 5(a).

4. Mar Caribe's Motion for Judgment on the Pleadings on its Defense of *Forum Non Conveniens* (Dkt.33), is **DENIED**.

5. Mar Caribe's Motion to Strike Opposition Memorandum (Dkt.59), and Motion to Strike Affidavit of Peter Gutowski (Dkt.60), are **DENIED**.

6. The Decision of Magistrate Judge Timothy J. Corrigan dated November 17, 1999 (Dkt.69), is **AFFIRMED**.

7. Plaintiff's Motion Requesting Judicial Rulings on Pending Motions or, in the Alternative, Status Conference and Oral Argument (Dkt.96) is **DENIED as moot.**